UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WILLIAM CAVANAGH,<br><br>    Plaintiff,<br><br>    v.<br><br>TOWN OF ASHLAND, GREGORY FAWKES, JOHN DRISCOLL, STEVEN ZANELLA, KEVIN PIERS, CHRISTOPHER ALBERINI, MICHAEL DIONNE, RICHARD BRIGGS, and JOHN PETRIN,<br><br>    Defendants. | Civil Action No. 1:09-cv-10132-WGY |

## VERIFIED COMPLAINT AND JURY DEMAND

For his Complaint against the named defendants, Plaintiff William Cavanagh makes the following allegations, under oath:

### I.    Parties

1. Plaintiff William Cavanagh ("Mr. Cavanagh") is an individual with a place of residence in Ashland, Massachusetts.

2. Defendant Town of Ashland is a town incorporated under the laws of the Commonwealth of Massachusetts with a place of business at 101 Main Street, Ashland, Massachusetts

3. Defendant Gregory Fawkes is an individual with a place of residence in Ashland, Massachusetts.

4. Defendant John Driscoll ("Fawkes") is an individual with a place of residence in Ashland, Massachusetts.

5. Upon information and belief, Defendant Steven Zanella ("Zanella") is an individual with a place of residence in Ashland, Massachusetts.

6. Upon information and belief, Defendant Kevin Piers ("Piers") is an individual with a place of residence in Ashland, Massachusetts

7. Upon information and belief, Defendant Chris Alberini ("Alberini") is an individual with a place of residence in Ashland, Massachusetts

8. Upon information and belief, Defendant Michael Dionne ("Dionne") is an individual with a place of residence in Ashland, Massachusetts.

9. Upon information and belief, Defendant Richard Briggs ("Briggs") is an individual with a place of residence in Medway, Massachusetts.

10. Upon information and belief, Defendant John Petrin ("Petrin") is an individual with a place of residence in Burlington, Middlesex County, Massachusetts.

## II. Jurisdiction and Venue

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1343 (a)(3), 28 U.S.C. §1331, 28 U.S.C. §1367, 42 U.S.C. §1981, and 42 U.S.C. §1983.

12. Venue is appropriate in this Court because the Plaintiff and all Defendants live or work within Middlesex County which is located within the venue of the United States District Court for the Eastern District of Massachusetts.

## IV. Facts Common To All Counts

13. At times relevant to this Complaint, Fawkes, Driscoll, Zanella, Piers, Alberini, Dionne and Briggs were members of the Ashland police department and conspired to harass Cavanagh, conspired to intimidate and interfere with Cavanagh's civil rights, and did harass Cavanagh and interfere with Cavanagh's

civil rights in retaliation for Cavanagh's wrongful report of unlawful conduct engaged in by members of the Town of Ashland Police Department.

14. At times relevant to the interference with and violation of Cavanagh's civil rights, Petrin was town manager and acting police commissioner in the Town of Ashland.

15. Due to the acts set forth herein by the named defendants, the means used to violate Cavanagh's civil rights became a policy or procedure adopted by the Town of Ashland and its acting police officials.

16. Prior to becoming a police officer in Ashland, Fawkes was a correctional officer.

17. In the mid-2000's, Fawkes arrested Cavanagh's son for a small crime.

18. Fawkes took an unusual interest in that matter, including traveling to Billerica house of correction to conduct personal interviews.

19. Cavanagh complained about Fawkes to the chief of police of Ashland at the time, Scott Rohmer.

20. This input clearly had some negative impact on Fawkes as, from that date forward, Fawkes has had repeated unlawful confrontations with Cavanagh. As set forth below, this conduct ultimately led to Fawkes's dismissal from the police department but not before Cavanagh was required to go through repeated, harrowing encounters with Fawkes and members of the police department that conspired with Fawkes to deprive Cavanagh of his civil rights.

21. Prior to June 2011, Fawkes's improper conduct toward Cavanagh was tolerated by Cavanagh as he did not want to exacerbate a difficult situation in the small town in which both he and Fawkes lived.

22. Indeed, Fawkes lives close enough to Cavanagh that Fawkes's wife would often walk or run by Cavanagh's house during, for instance, her exercise routine.

23. Prior to June 4, 2011, this presented no problems. If Fawkes's wife walked by the Cavanagh home, she would engage in normal, neighborly conversation with Cavanagh or his wife. There was nothing more or less to it.

24. On June 4, 2011, this changed. On that day, after the usual brief exchange of pleasantries with Fawkes's wife, Cavanagh returned home to find Fawkes (who was then off-duty) waiting in Fawkes's pickup truck parked near Cavanagh's driveway.

25. As Cavanagh went into his yard, Fawkes followed him menacingly, entered Cavanagh's driveway and, in a menacing way, aggressively came within Cavanagh's personal space and started to yell at Cavanagh about his wife.

26. Purportedly, Fawkes was under the impression (which was false) that Cavanagh had made an inappropriate overture to Fawkes's wife that morning. Fawkes began screaming obscenities at Cavanagh and said words to the effect of: "You're a scumbag and everyone thinks you're a scumbag", "I don't come from here, I come from the city," and " This is my town, not yours."

27. Fawkes indicated that the police department was under his control as president of the police union and that:" If you come to the police station to complain about me, I'll throw you out and no one will believe your story."

28. Fawkes claimed that he had undertaken an investigation of Cavanagh and yelled loud enough for Cavanagh's neighbors to hear that Cavanagh had committed a

sexual assault several years earlier. This statement was untrue and Fawkes knew it to be untrue.

29. Fawkes made this statement in front of Cavanagh's wife and 9 year-old son who had come outside to see what the commotion was about. In addition, Cavanagh's neighbor witnessed the entire confrontation.

30. While Fawkes confronted Cavanagh, Cavanagh repeatedly requested that Fawkes leave his property. Fawkes repeatedly refused.

31. Finally, Driscoll, who was then an on-duty police officer, arrived. Driscoll parked his police cruiser across the entrance of Cavanagh's driveway so that Cavanagh could not voluntarily leave the premises.

32. Cavanagh requested that Driscoll assist and have Fawkes leave his property. Driscoll refused and falsely represented that: "Fawkes is on an official investigation" and that Driscoll was there to back Fawkes up.

33. At this point, both Fawkes and Driscoll were engaging in harassment of Cavanagh and both refused to leave the premises. Both indicated that he was being stopped and investigated, but neither would reveal any valid reasons for their actions.

34. Cavanagh then attempted to take his wife by the arm and escort her into his house to get away from the escalating situation.

35. Fawkes stated he intended to charge Cavanagh for assault against his wife due to this action.

36. Finally, not knowing what Fawkes and Driscoll might do, Cavanagh and his wife retreated into their home. Fawkes and Driscoll left.

37. The ordeal was threatening and emotionally distressing to both Cavanagh and his wife. They did not know whether Fawkes and Driscoll intended to return or what further action, such as the threatened assault charge, might result. They were petrified and could not sleep all night and for several weeks thereafter.

38. Shortly after the encounter, Cavanagh called the police station and asked to speak to the officer in charge.

39. On that day, the officer in charge was Zannella. Zanella stated that nothing that Fawkes had doe was wrong and he "would've done the same thing." Zanella said no investigation of the matter would be undertaken. Unfortunately, Cavanagh had unwittingly put Fawkes and a group of rogue officers controlled by Fawkes on notice that he intended to bring Fawkes's unlawful conduct to the attention of the department. The results have been devastating to Cavanagh.

40. Later on June 4, 2011, Foster came to Cavanagh's home to serve him with a temporary harassment order issued by Framingham District Court that purportedly resulted from a complaint made by Fawkes's wife. Upon information and belief, this process was used to further, promote, and use as a defense to the unlawful conduct of Fawkes and Driscoll that day (and in the days that followed).

41. The affidavit filed by Fawkes's wife admitted, curiously, that she voluntarily made it a routine to go by Cavanagh's house over the previous year and one-half and alleged that Cavanagh tried to engage her in conversation "about 25 times" over that period. What she did not state in her affidavit was, to the extent that that allegation was true, why she continued to go by Cavanagh's house during her regular exercise routine if she was offended by him.

42. On Monday, June 6, 2011, an order was issued restraining Cavanagh from contacting Fawkes's wife based upon the allegations made on June 4, 2011.

43. Cavanagh went to the court and found that the process for obtaining the restraining order appeared to have been manipulated by Fawkes. The Court personnel advised Cavanagh that in order for a restraining order to issue to a citizen in that situation, she would have had to have documented three encounters with the plaintiff that placed her in fear. Given that this was the first documented encounter with Cavanagh, the Court personnel could not surmise why an Order issued. Upon information and belief, Fawkes used his position as a police officer to assist in obtaining a restraining order that should not have issued.

44. Eventually, the order was dismissed in September 2012.

45. As would become a pattern, later during June 2011, Cavanagh was pulled over by Piers, then an on-duty officer, purportedly for a registration check. However, the stop was purposefully fraudulent and, upon information and belief, intended only to harass Cavanagh and deprive him of his rights. After first pulling Cavanagh's car over and receiving Cavanagh's license and registration, Piers instructed Cavanagh to drive several miles to Cavanagh's home. Piers followed in his police cruiser. Once they arrived at Cavanagh's home, Piers forced Cavanagh from his vehicle and made him sit on the wall outside his house in public view of his neighbors. At that point, Piers did a top to bottom vehicle search of Cavanagh's entire truck. He had no legal reason to do so and provided none.

46. During this time, Alberini, who was an on-duty police officer, pulled up to Cavanagh's home in a police vehicle with canine patrol. Alberini blocked the end

of Cavanagh's driveway so that Cavanagh could not depart the premises. Cavanagh was advised that he was not permitted to leave. No basis for holding Cavanagh was provided.

47. Nothing was found by these officers and no charges were brought. However, both Alberini and Foster made it clear that they were acting at the direction of Fawkes.

48. Cavanagh became afraid to report this and similar incidents to the police as it became clear that Fawkes, who was the president of the police union, controlled a rogue group of officers who could and would retaliate for reports of harassment.

49. On another occasion, Cavanagh went to his son's elementary school to pick him up. Fawkes, who was off duty, was in a line to pick up his own child. Fawkes called for an officer on duty to come to the scene claiming, falsely, that Cavanagh's presence at the school violated the restraining order pertaining to Fawkes's wife.

50. Dionne, an on-duty officer, came to the scene and violently approached Cavanagh in front of many witnesses who waited in line at the school. Dionne approached Cavanagh's window and, among other things, screamed that Cavanagh must stay away from Fawkes under a Court Restraining Order. Dionne did not make an arrest or a formal report of the incident as the Order had not been violated. By continuing to loudly threaten Cavanagh with arrest, however, Dionne did purposefully intimidate and humiliate Cavanagh in front of school officials and other parents and interfered with his civil rights. Again, Cavanagh was distraught, emotionally disturbed and unable to sleep due to the encounter.

51. Finally, Cavanagh filed a complaint with the Ashland Police Department, but officials within that department, who, upon information and belief, were inspired or controlled by Fawkes interrupted and impeded the investigation.

52. Petrin, who was acting commissioner, also refused to proceed with the investigation and, rather, took actions and made omissions that made it a policy of the Town and Department to refrain from pursuing the violation of Cavanagh's civil rights.

53. At one point, when the chief of police was on vacation, Lt. David Boudoin of the Police Department did finally order Lt. Richard Briggs to start an investigation. Upon information and belief, Briggs refused to do so on instruction from, or in conspiracy with, Fawkes.

54. When the chief of police returned from vacation, he did order Briggs to undertake the investigation requested by Lt. Boudoin.

55. Knowing that he could not longer refuse the request from the chief, Briggs purported to conduct an investigation, but failed to do so in good faith. Rather, he called and harassed Cavanagh on the phone and threatened that things would not turn out well for Cavanagh if he continued to pursue the claim against Fawkes.

56. Almost in a panic due to the wide-range and institutional nature of the threats now coming from members of the Ashland Police, Cavanagh went to the Town Manager and acting police commissioner, Petrin, for help.

57. Petrin stated that he wouldn't get involved in "internal police affairs". Cavanagh stated that he was distraught and believed that this was Petrin's duty as "acting police commissioner" at the time. Petrin nonetheless continued to refuse.

58. Cavanagh contacted John Fetherston, Chairman of Ashland's Board of Selectman. Upon information and belief, Fetherston explained to Petrin that Cavanagh's rights were being violated by members of the Ashland Police Department and that these allegations needed to be investigated. Petrin still refused to take action.

59. Since the Ashland Police Department failed and refused to properly investigate the matter internally, the chief of police, Scott Rohmer, employed and outside investigator, Chief Ed McGinn of the Worcester Police Department to conduct an independent investigation.

60. As a result, Fawkes gathered a group of police officers who he led as union president and filed a vote of "no confidence" in Chief Rohmer.

61. Upon information and belief, the independent investigation found that Fawkes did violate Cavanagh's civil rights. The Town of Ashland has failed and refused to provide this report despite repeated requests, including under the Freedom of Information Act.

62. In any event, due to the findings in the independent investigation, Petrin was forced to fire Fawkes after having protected his conduct for many months by not seeing to an investigation earlier.

V. **Causes of Action**

**COUNT I**
(Violation of 42 U.S.C.A. § 1983, Civil Rights Act)

63. Cavanagh restates and realleges each of the above paragraphs and incorporates them herein by reference.

64. Defendants deprived Cavanagh of his civil rights, privileges and immunities secured by the laws and Constitution of the United States of America; including but not limited to harassing Cavanagh in their official capacities, conducting unwarranted and illegal searches and seizures of his person and property, intimidating Cavanagh in public places, defaming Cavanagh.

65. In taking the unlawful actions described in this Complaint, Defendants acted under the color of local and state law, including the authority granted in them in their official capacities as police officers and town manager/acting police commissioner.

66. Defendants' acts and practices subjected Cavanagh, or caused Cavanagh to be subjected, to the deprivation of the rights, privileges and immunities secured by the United States Constitution and laws of the United States, including but not limited to his rights under the First and Fourth Amendment to United States Constitution. These acts and practices were the proximate cause of injuries and resulting damages to Cavanagh, including depriving him of valuable benefits of his business.

67. Cavanagh is entitled to be compensated for the violations of his civil rights as provided in 42 U.S.C.A § 1983 et seq. and as otherwise allowed at law and in equity in an amount to be determined at trial.

### COUNT II
(Violation of 42 U.S.C.A. § 1983, Civil Rights Act )

68. Cavanagh restates and realleges each of the above paragraphs and incorporates them herein by reference.

69. Upon information and belief, the unconstitutional actions of the Defendants implemented or executed a policy, statement, or decision officially adopted and promulgated by Petrin, the acting police commissioner, the Town of Ashland, and/or the Town of Ashland Police Department.

70. The individual Defendants' practices and actions aimed at Cavanagh appear to have been so well settled by the Town of Ashland and its Police Department that they constitute a custom or usage by the Town of Ashland and its Police Department.

71. Therefore, these practices and actions carried the force of law in the Town of Ashland and its Police Department. These customs and practices were so pervasive that, upon information and belief, Town of Ashland policy makers, including Petrin, had actual or constructive knowledge of and acquiesced to the unconstitutional customs and practices.

72. In addition, the Town of Ashland and its Police Department, upon information and belief, failed to properly train, supervise, investigate and discipline its employees to prevent these customs and practices from manifesting themselves through the Town of Ashland and its Police Department.

73. Cavanagh is entitled to be compensated for the violations of his civil rights as provided in 42 U.S.C.A § 1983 et seq. and as otherwise allowed at law and in equity in an amount to be determined at trial.

## COUNT III
(Violation of Mass. G.L. c. 12, § 11I (the Massachusetts Civil Rights Act)

74. Cavanagh restates and realleges each of the above paragraphs and incorporates them herein by reference.

75. Defendants deprived or interfered with (or attempted to interfere with) the rights, privileges and immunities of Cavanagh secured by the laws and Constitution of the United States of America and Commonwealth of Massachusetts by threats, intimidation or coercion; including but not limited to retaliating against Cavanagh and instituting a series of civil rights violations against him that impaired, interrupted and violated the protections afforded by the First and Fourth Amendments of the United States Constitution.

76. In taking the unlawful actions described in this Complaint, Defendants acted under the color of local and state law, including the authority granted in them as town manager, police commissioner and/or police officers of the Town of Ashland, Massachusetts.

77. Defendants' acts and practices subjected Cavanagh, or caused Cavanagh to be subjected, to the deprivation of the rights, privileges and immunities secured by the United States Constitution and laws of the United States, including but not limited to his rights under the First and Fourth Amendments to United States Constitution.

78. These acts and practices were the proximate cause of injuries and resulting damages to Cavanagh, including depriving Cavanagh of valuable benefits of his employment.

79. Cavanagh is entitled to be compensated for the violations of his civil rights as provided in Mass. G.L. c. 12, § 11I et seq. and as otherwise allowed at law and in equity in an amount to be determined at trial.

### COUNT IV
(Violation of Mass. G.L. c. 12, § 11I, Massachusetts Civil Rights Act)

80. Cavanagh restates and realleges each of the above paragraphs and incorporates them herein by reference.

81. Upon information and belief, the unconstitutional actions of the individual Defendants implemented or executed a policy, statement, or decision officially adopted and promulgated by the town manager, police commissioner, Town of Ashland, and the Town of Ashland Police Department.

82. The individual Defendants' practices and actions aimed at Cavanagh appear to be so well settled by the Town of Ashland and its Police Department that they constitute a custom or usage by the Town of Ashland and its Police Department.

83. Therefore, these practices and actions carry the force of law in the Town of Ashland and its Police Department. These customs and practices were so pervasive that, upon information and belief, Town of Ashland policy makers had actual or constructive knowledge of and acquiesced to the unconstitutional customs and practices.

84. In addition, the Town of Ashland and its Police Department, upon information and belief, failed to properly train, supervise, and discipline its employees to prevent these customs and practices from manifesting themselves through the Town of Ashland and its Police Department.

85. Cavanagh is entitled to be compensated for the violations of his civil rights as provided in G.L. c. 12, § 11I et seq. and as otherwise allowed at law and in equity in an amount to be determined at trial.

## COUNT V

(Intentional Infliction of Emotional Distress)

86. Cavanagh restates and realleges each of the above paragraphs and incorporates them herein by reference.

87. Through the conduct alleged in this Complaint, Defendants intended to inflict emotional distress upon Cavanagh or knew or should have known that emotional distress was likely to result from their conduct.

88. Defendants' conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community.

89. Defendants' conduct caused Cavanagh to suffer extreme emotional distress.

90. Cavanagh's emotional distress was severe and of a nature that no reasonable person could be expected to endure.

91. Cavanagh suffered both physical and emotional harm as a result of the conduct of Defendants.

92. The Town of Ashland and its Police Department are vicariously liable for the acts of their agents.

93. Cavanagh seeks compensation for the harm inflicted upon him in an amount to be determined at trial.

## VI. <u>Jury Demand</u>

Cavanagh hereby demands a trial by jury on all counts to which he is entitled to a trial by jury.

**WHEREFORE**, Cavanagh requests that this Honorable Court:

1. Enter judgment in favor of Cavanagh on each count stated herein;

2. Award Cavanagh all damages, costs, interest and attorney's fees recoverable at law and in equity, including punitive damages where appropriate; and

3. Award such other and further relief as is just and proper under the law and statutes set forth herein.

Respectfully submitted,

**PLAINTIFF WILLIAM CAVANAGH,**

By his attorney,

/s/ *Timothy J. Perry*
Timothy J. Perry (BBO #631397)
PERRY, KRUMSIEK & DOLAN LLP
210 Union Wharf
Boston, MA 02109
(617) 720-4300
facsimile (617) 720-4310

## **VERIFICATION**

I, William Cavanagh, do hereby verify under oath and pains and penalties of perjury that I have personal knowledge that the foregoing allegations in this Verified Complaint are true; except those allegations stated upon information and belief, which allegations I believe to be true.

Dated: May 20, 2013

_____
William Cavanagh